Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALNISE JOSEPH, Individually and on behalf of A.J. as her Guardian Ad Litem, *Plaintiff*, v. JOSEPH VAYDOVSKY, M.D., *et al. Defendants.* | Civil Action No. 17-927 (JMV)(MF) **OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case concerns alleged medical malpractice by a doctor employed by the Newark Community Health Center ("NCHC"), who assisted Plaintiff Walnise Joseph in the birth of her child, A.J. The issue before the Court is whether NCHC is immune from liability, and if not, whether Plaintiffs' damages are capped by statute at $250,000. The United States (the "Government") filed the instant motion to dismiss for lack of subject matter jurisdiction, or in the alternative, for summary judgment or partial summary judgment on the issue of damages. D.E. 12. The Court reviewed the parties' submissions[1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons set forth below, the Government's motion to dismiss is **DENIED**, and its motion for partial summary judgment is **GRANTED**.

---

[1] The following briefs were submitted in connection with this motion: Defendant's Brief in Support, D.E. 12, hereinafter "Defendant's Brief" or "Def. Br."; Plaintiff's Brief in Opposition, D.E. 13, hereinafter "Opposition" or "Opp."; Defendant's Reply Brief in Support, D.E. 16, hereinafter "Reply" or "Reply Br."

## I. FACTUAL BACKGROUND

The following facts are taken from the Complaint. D.E. 1. ("Complaint" or "Compl.").[2] On or about July 18, 2013, at forty-weeks pregnant, Walnise Joseph was admitted to Newark Beth Israel Medical Center. *Id.* at 8. Ms. Joseph was experiencing contractions and fetal monitoring strips indicated "limited variability and recurring decelerations." *Id.* Dr. Tabassum Sabzwari, D.O., an employee of NCHC, delayed in calling for the performance of a cesarean section so that the procedure was no longer a viable option. *Id.* After the child's head was delivered, there were indications of "shoulder dystocia." *Id.*

After Dr. Sabzwari performed two methods used to deliver fetuses with shoulder dystopia, he called for assistance. *Id.* at 8-9. Dr. Joseph Vaydovsky, M.D., an employee of Raritan Obstetrical Gynecological Associates, PA ("Raritan") arrived three to four minutes after the delivery of the head, and "extracted the posterior arm, which finally allowed the shoulder to come beneath the sumphysis [sic] pubis and allowed the baby to be born." *Id.* at 9. However, "Dr. Sabzwari and/or Dr. Vaydovsky applied unwarranted . . . lateral traction . . . sufficient to cause avulsion of nerve roots and to inflict permanent damage." *Id.* As a result of hypoxic-ischemic encephalopathy and the alleged excessive lateral traction to the head, the delivery "resulted in a bilateral brachial plexus injury." *Id.* at 10. According to Plaintiffs, this injury is permanent. *Id.*

In accordance with the terms of the Federal Tort Claims Act ("FTCA"), Plaintiffs' "counsel submitted a Standard Form 95 Administrative Claim for a sum certain" on or about June 29, 2015. *Id.* at 4. On March 17, 2016, the claims were denied. *Id.* Plaintiffs filed for reconsideration, and on October 26, 2016, Plaintiffs' claims on appeal were denied. *Id.* at 5.

---

[2] The Complaint is referenced by page number because the paragraphs are not consecutively numbered throughout.

Plaintiffs filed the Complaint on February 11, 2017. D.E. 1. The Complaint lists three counts for (1) negligence against the United States, Vaydovsky, and Raritan;[3] (2) *respondeat superior* liability against the United States; and (3) *respondeat superior* liability against Raritan. *Id.* at 5-12. Plaintiffs seek $5,000,000 in damages. *Id.* at 12. Defendant Vaydovsky filed an Answer to the Complaint on May 9, 2017. D.E. 5. The Government filed the instant motion on August 21, 2017, D.E. 12, which Plaintiffs opposed. D.E. 13. The Government filed a reply. D.E. 16. The Government has since filed supplemental authority. D.E. 25. Dr. Vaydovsky filed an Answer, D.E. 5. As noted, he is an employee of a separate organization, Raritan. As a result, he has not participated in the current motion.

The following facts were taken from the Government's Statement of Material Facts in support of their motion for partial summary judgment.[4] D.E. 12-2 ("SOMF"). NCHC was deemed a Federally Qualified Health Center ("FQHC") in 1996; as a result, NCHC has been deemed a federal employee eligible for malpractice coverage under the FTCA since June 23, 1996. SOMF at ¶¶ 3-4. NCHC was founded as a "private, non-profit charitable ambulatory care facility" that serves a "medically underserved population" in Newark, New Jersey. *Id.* at ¶ 2. NCHC has been tax-exempt under Section 501(c)(3) of the Internal Revenue Code, "and classified as a public charity" under Section 509(a)(1) since its founding in 1987. *Id.* at ¶ 23. Article II of NCHC's bylaws—that were in effect from 2012-2013—state its purpose as a non-profit "organized exclusively for charitable, scientific, and educational purposes." *Id.* at ¶ 8. "The purpose of the

---

[3] The Complaint also lists John Does, Janes Roes, and John Doe Employers as Defendants.

[4] Plaintiffs responded to the Government's SOMF in their Opposition brief at pg. 4-5. *See* D.E. 13-1. Plaintiffs admitted all but five paragraphs, but the five objections pertain to the interpretation of the relevant statutes. Opp. at 4-5; *see also* Reply at 1 ("The Plaintiff merely disagrees at to the application of the law to the facts. Therefore, the facts are undisputed for purposes of the United States' motion.").

3

corporation is to provide ambulatory health care services, consistent with its funding and mandate as a [FQHC], including, but not limited to, primary health care services and such supplementary services as are necessary to fulfill the mission of the corporation." *Id.* NCHC's Certificate of Incorporation states their nonprofit status and charitable purpose:

> A. To provide comprehensive primary health services including the services of physicians, physician's assistants, nurse clinicians and other health providers; dental services, diagnostic laboratory and radiologic services, preventive health services (including children's eye and ear examinations to determine the need for vision and hearing corrections, prenatal services, well child services, preventive dental services and family planning services) emergency medical services and transportation services required for adequate patient care;
>
> B. To provide as appropriate supplemental health services, including hospital services, home health services, extended care facilities service, rehabilitative services (including physical therapy) and long term physical medicine, dental services, vision services, allied health services, pharmaceutical services, therapeutic radiologic services, public health services (including nutrition, education and social services), health education services and services which promote optimal use of primary and supplementary health services including as necessary and appropriate services of bi-lingual outreach workers.

*Id.* at ¶ 6.

Their funding policy is stated in Article III of the bylaws:

> NCHC shall apply for, and be maintained and supported by, contributions, donations and legacies from the general public, by such grants as may be received from governmental or charitable bodies, and by such fees and charges as may be collected from patients and from such other sources of revenue as the Board of Trustees in its discretion may accept and provide.
>
> The corporation shall use its best efforts to apply for all appropriate grants and funding consistent with its mission and shall provide services consistent with funding received.

*Id.* at ¶ 9.

NCHC uses a "sliding fee scale based on patient family size and ability to pay." *Id.* at ¶ 12. A patient, however, will not be turned away if they do not have the ability to pay. *Id.* "NCHC bills a patient for any unpaid account balance three times," after which it is written off as bad debt. *Id.* In 2012, NCHC brought in more than $22,000,000 in net revenue. *Id.* at ¶ 29. Of that amount, from patient service revenue, the largest percentage came from Medicare Managed Care with 42%. *Id.* Of non-patient revenue, the majority came from government grants and "other grants and contributions" – each at 40%. *Id.* at ¶ 30. The vast majority of government grant money came from the U.S. Department of Health and Human Services. *Id.* at ¶¶ 33-34.

## II. STANDARD OF REVIEW

### A. Subject Matter Jurisdiction

In deciding a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court must first determine whether the moving party presents a facial or factual attack. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "A facial attack concerns an alleged pleading deficiency whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Young v. United States*, 152 F. Supp. 3d 337, 345 (D.N.J. 2015). The Government has presented this Court with a factual attack. A factual attack asks the court to "look beyond the pleadings" and consider whether "there is no subject matter jurisdiction because the facts of the case ... do not support the asserted jurisdiction." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). When a defendant raises a factual challenge, no presumption of truthfulness attaches to the allegations in a complaint. *Tucker v. Sec'y of Health & Human Servs.*, 487 F. App'x 52, 54 (3d Cir. 2012) (citation omitted). Instead, a court considers the evidence presented by the parties. *CNA v. United States*, 535 F.3d 132, 144-45 (3d Cir. 2008) (internal

quotation marks omitted). The burden of persuasion is placed on plaintiffs to establish jurisdiction, and the Court may make factual findings beyond the pleadings that are decisive to determining jurisdiction. *CNA*, 535 F.3d at 145; *see also U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007). However, the Court is also mindful of the fact that as this particular jurisdictional issue that is "intertwined with the merits," the Court will "demand less in the way of jurisdictional proof than would be appropriate at a trial stage." *See CNA*, 535 F.3d at 144-45 (internal quotation marks omitted).

### B. Summary Judgment Standard

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III. LAW AND ANALYSIS

The Government makes two arguments: first, that NCHC is entitled to absolute immunity under the New Jersey Charitable Immunity Act ("NJCIA"), N.J.S.A. 2A:53A-7 ("Section 7"); and second, that if NCHC is not immune, damages should be capped at $250,000 under a separate provision of the NJCIA, N.J.S.A. 2A:53A-8 ("Section 8").

#### A. Sovereign Immunity

Under the Eleventh Amendment, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XL. The United States Supreme Court has interpreted the Eleventh Amendment as

7

affirming "the fundamental principle of sovereign immunity" as a limit on a federal court's judicial authority. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).

Due to sovereign immunity, a federal court does not have jurisdiction over suits against the United States unless Congress, by statute, expressly and unequivocally waives the United States' immunity to suit. *United States v. Craig*, 694 F.3d 509, 511 (3d Cir. 2012) (internal quotation marks omitted). As a FQHC, under the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(a)-(n) ("FSHCAA"), both the NCHC and its employees are considered "employees" of the Public Health Service ("PHS") under the FTCA. 42 U.S.C. §§ 233(g)-(n); 28 U.S.C. §§ 1346(b), 2671-2680. The United States is the only proper defendant in an action against an FQHC for damages due to personal injuries arising from the provision of medical, surgical, dental, or related functions. 42 U.S.C. § 233(a). The United States, however, is only liable to the extent of its express waiver of sovereign immunity in the FTCA. *Id.*; *see S.M. v. United States*, 2016 WL 7374530, at *2 (D.N.J. Dec. 20, 2016); *see also United States v. Bein*, 214 F.3d 408, 412 (3d Cir. 2000) (indicating that not only must waivers of sovereign immunity be unequivocally expressed, the waiver must also be strictly construed in favor of the sovereign).

The FTCA "does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court." *Lomando v. United States*, 667 F.3d 363, 372 (3d Cir. 2011). "Accordingly, 'the extent of the United States' liability under the FTCA is generally determined by reference to state tort law.'" *Id.* Neither party contests that New Jersey law applies here.

Under the FTCA, the United States is liable for "tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Essentially, the United States acts as an employer with *respondeat superior* liability for its employees under the

FTCA. *See Lomando*, 667 F.3d at 374 (3d Cir. 2011). Thus, the United States "stands in the shoes" of NCHC, and can assert "any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defense to which the United States is entitled." *Id.* (citing 28 U.S.C. § 2674).

The party bringing a claim under the FTCA must satisfy the six threshold requirements of 28 U.S.C. §1346(b)(1). *See Gremminger v. United States*, 2017 WL 1170853, at *3 (D.N.J. Mar. 29, 2017). The FTCA claim must be made

> (1) against the United States, (2) for money damages, ... (3) for injury or loss of property, or personal injury or death (4) caused by the negligent or wrongful act or omission of any employee of the Government (5) while acting within the scope of his office or employment, (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*CNA*, 535 F.3d at 141 (internal quotation marks omitted). Here the dispute centers on the final criteria because the NJCIA is the "law of the place," that is, New Jersey. *See Gremminger*, 2017 WL 1170853, at *3.

Plaintiffs do not contest that NCHC can raise a defense under the NJCIA. Instead they argue that Section 8 applies,[5] while Defendant argues that it is entitled to absolute immunity under Section 7. "The most prominent distinction between nonprofit entities organized exclusively for charitable, religious, or educational purposes [under Section 7] and nonprofits organized

---

[5] Plaintiffs argue in their Opposition that because all six elements under § 1346(b)(1) are met, this Court has subject matter jurisdiction. Opp. at 3-4. Plaintiffs appear to be arguing that absolute immunity under Section 7 does not impact the Court's subject matter jurisdiction. The Court disagrees. *See Young*, 152 F. Supp. 3d 337, 343-44 (D.N.J. 2015) ("Because 'being liable to the claimant in accordance with the law of the place' is an element of jurisdiction under the statute, the issue of absolute immunity of the Government is an issue of jurisdiction.") (citing *CNA*, 535 F. 3d at 143-44)

9

exclusively for hospital purposes [under Section 8] is that the former are immune from liability while the latter are subject to liability for negligence, albeit with a cap on its damages." *Kuchera v. Jersey Shore Family Health Ctr.*, 221 N.J. 239, 247 (2015).

Section 7 of the NJCIA provides in relevant part as follows:

> a. No nonprofit corporation, society or association organized exclusively *for religious, charitable or educational purposes* or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.

N.J.S.A. 2A:53A-7(a) (emphasis added); *see also Bieker v. Cmty. House of Moorestown*, 169 N.J. 167, 175 (2001).

Section 8, in turn, provides as follows:

> Notwithstanding the provisions of [N.J.S.A. 2A:53A-7], any nonprofit corporation, society or association *organized exclusively for hospital purposes* shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $250,000, together with interest and costs of suit, as the result of any one accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $250,000 such nonprofit corporation, society or association organized exclusively for hospital purposes shall not be liable therefor.

N.J.S.A. 2A:53A-8 (emphasis added); *See also Kuchera*, 221 N.J. at 249 (observing that a nonprofit hospital is subject to limited liability under Section 8 if "it is formed as a nonprofit corporation, sociality, or association, is organized exclusively for hospital purposes, was

10

promoting those objectives and purposes at the time plaintiff was injured, and the plaintiff was a beneficiary of the activities of the hospital.").

In determining whether Section 7 or Section 8 of the NJCIA applies, a relatively recent New Jersey Supreme Court case is instructive. In *Kuchera*, the Court held that deciding which section applies "turns on the purpose of the [nonprofit] institution, not the use to which the facility is put on any given day." 221 N.J. 239, 242 (2008). The plaintiff in *Kuchera* slipped and fell while attending a free eye screening held at a family health care facility of a regional teaching hospital. *Id.* at 241. The organizer of the screening was the New Jersey Commission for the Blind and Visually Impaired, and the event was staffed by employees of both organizations. *Id.* at 242.

In determining whether an organization is a hospital, the Court in *Kuchera* considered whether "a patient can obtain twenty-four hour continuous care" at the facility. *Id.* at 250. The *Kuchera* Court added the following:

> [T]he core aspects of a hospital's purposes are to address the needs of all of the types of patients that a hospital is expected to serve. Therefore, we hold that any medical service that a hospital patient may require pre-admission, during a hospital stay, or post-admission, constitutes a presumptive core 'hospital purpose' under [the NJCIA]."

*Id.* at 250-51 (quoting *Hunterdon Medical Center v. Township of Readington*, 195 N.J. 549, 572, (2008)). The New Jersey Supreme Court stressed that the modern definition of a hospital is more expansive than that used by the Appellate Division, which previously held that the defendant was a "hybrid" charity-hospital. Instead, the New Jersey Supreme Court overturned the Appellate Division's holding and decided that Section 8 applied and that damages were limited to $250,000. In doing so, the Court acknowledged that "[t]he provision of charity care is a core function of a hospital." *Id.* at 254.

11

In a 2015 case, Judge Kugler from this District reached the same result. *Young*, 152 F. Supp. 3d 337 at 350. In *Young*, Judge Kugler noted that the New Jersey Supreme in *Kuchera* expanded the definition of "hospital purposes" which resulted in a "complimentary narrowing of 'charitable purposes'" under the NJCIA. *Id.* In *Young*, the plaintiff, when pregnant, was admitted to Cooper University Hospital ("CUH") and treated by CUH physicians and doctors employed by CAMcare Health Corporation ("CAMcare"). *Id.* at 340. Similar to the current case, there was a delay in giving the plaintiff the necessary care during her delivery, which resulted in her child's permanent medical disability. *Id.* at 341. Like NCHC, CAMcare was a FQHC. *Id.* at 340. CAMcare's mission statement was "to provide high quality comprehensive *primary health care* to the families we serve." *Id.* at 350 (emphasis in original).

The court in *Young*, relying on *Kuchera*, decided that CAMcare "can be nothing other than an organization that is 'exclusively for hospital purposes' and is certainly not 'exclusively for charitable purposes.'" *Id.* at 349. As a result, Judge Kugler denied complete immunity under Section 7 and instead applied Section 8 with its corresponding statutory cap on damages of $250,000 pursuant to Section 8, as opposed to complete immunity under Section 7. *Id.* The *Young* court reasoned as follows:

> The Government in seeking absolute immunity under the NJCIA, argues that CAMcare is a charitable organization because it "provides comprehensive health services to underserved families—regardless of insurance status or ability to pay—in the City of Camden and throughout Camden and Gloucester Counties." But this is the very definition of charity care, and as stated by the New Jersey Supreme Court, a "core function of a hospital." To find otherwise would be contrary to the settled state law.
>
> Indeed, the evidence the Government points to in support of being organized for charitable purposes directs this court to the conclusion that CAMcare is actually organized for hospital purposes. Each of the first five statements contained in CAMcare's corporate purpose section on its Certificate of Incorporation explicitly mention "health

12

> services" and a laundry list of other medical services provided by the modern day hospital. The remaining statements in the corporate purpose section deal with functions related to hospital purposes—such as billing for services rendered, providing residency programs, and conducting research—or the basic functions of a non-profit related to fundraising and operations. These same corporate purposes were incorporated into CAMcare's Bylaws, which state on the cover of the document that CAMcare's mission statement is "to provide high quality comprehensive *primary health care* to the families we serve."
>
> This can be nothing other than an organization that is "exclusively for hospital purposes" and is certainly not "exclusively for charitable purposes." As the New Jersey Supreme Court noted, an organization can only avail itself of one immunity provision or the other. *See Kuchera,* 221 N.J. at 247, 111 A.3d 84. The burden is on Young as plaintiff to prove jurisdiction, which she has done sufficiently in the SAC. The Government has failed to present evidence to overcome the pleadings or even call them into question; rather, the Government has supported the argument against itself by showing that it does not qualify for absolute immunity. Accordingly, the Government's Initial Motion with respect to the absolute immunity defense will be denied.

*Id.* at 350 (citations omitted).

In three other medical malpractice cases, courts within this District have found that the government was not subject to charitable immunity under Section 7, but instead was entitled to the $250,000 damage cap set forth in Section 8 of NJCIA. In *S.M. v. United States*, the plaintiff alleged that CompleteCare Health Network ("CompleteCare") failed to offer her timely prenatal screening for Down Syndrome before the birth of her child. 2016 WL 7374530, at *1. The court found that CompleteCare was a "modern hospital," based on the variety of medical and health related services that it provided its patients, and the training and supervising it provided its medical residents. *Id.* at *5-6. Consequently, the court held that the government was only entitled to immunity under Section 8. *Id.* In *Gremminger*, the plaintiff alleged that while in the care of America and Monmouth Family Health Center (MFHC), she received inadequate medical treatment, which

13

resulted in the stillbirth of her child. 2017 WL 1170853, at *1. The court there found that MFHC's funding structure and billing practices demonstrated that it was organized for a hospital purpose rather than a charitable one, especially since it did not solicit charitable contributions nor engage in fundraising efforts. *Id.* at *8. Similarly, in *Juarez-Atilano v. United States*, plaintiff had complications during birth, resulting in an emergency cesarean section and a stillbirth at Ocean Health Initiatives, Inc. ("OHI"), a FQHC. 2018 WL 3866693, at *1 (D.N.J. Aug. 14, 2018). The court found that because OHI provided numerous hospital services to underprivileged individuals in the community and these functions were comparable to functions a hospital would perform, OHI was subject to Section 8's damage cap. *Id.* at *8.

In light of the New Jersey Supreme Court's ruling in *Kuchera*, which expanded the definition of a hospital under Section 8 to reflect modern reality, the Court also concludes that NCHC is also a "nonprofit corporation organized exclusively for hospital purposes." The facts in this matter are remarkably similar to those in *Young*, and the Court finds Judge Kugler's thorough analysis and reasoning to be persuasive. NCHC provides health care services to underserved populations and treats regardless of ability to pay. NCHC's bylaws indicate that its purpose, among things, is to provide "primary care services[.]" Section A of NCHC's Certificate of Incorporation indicates that its purpose, among other things, is "[t]o provide comprehensive primary health services[.]" D.E. 12-2 at ¶ 6. Certain of the non-exclusive services listed include traditional hospital functions such as diagnostic, radiologic, and emergency services. *Id.* In fact, Section B of the Certificate indicates that NCHC is to provide "hospital services[.]" The conclusion that NCHC is a hospital under Section 8 is also buttressed by persuasive reasoning in *S.M.*, *Gremminger*, and *Juarez-Atilano*. For purposes of Section 8 of the NJCIA, NCHC is a "modern hospital" and is organized for "hospital purposes."

14

Consistent with the recent decisions of the New Jersey Supreme Court and this District, the Court finds that NCHC is subject to Section 8 rather than Section 7 of the NCIA. As a result, the Government's motion to dismiss for lack of subject matter jurisdiction is denied.

### B. Partial Summary Judgment

Because NCHC (and as a result, the United States here) is subject to Section 8 of the NJCIA, there is a corresponding $250,000 cap on damages. N.J.S.A. 2A:53A-8. Plaintiffs do not contest that the cap should not apply; instead, they argue that the statutory cap should not apply to the alleged negligence of the individual healthcare provider, Dr. Sabzwari. Opp. at 9-10. In support of their argument, Plaintiffs rely on the following language from Section 7, not Section 8, of the NJCIA: "Nothing in this subsection shall be deemed to grant immunity to any health care provider, in the practice of his profession, who is a compensated employee, agent or servant of any nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes." N.J.S.A. 2A:53A-7(a).

Plaintiffs' argument is foreclosed by 42 U.S.C. § 233. As noted, there is no dispute that NCHC and its employees (including Dr. Sabzwari) are employees of the Public Health Service for purposes of the FTCA, and, as a result, the United States is the only proper defendant in this matter. 42 U.S.C. § 233(a), (g). As the Court in *Young* observed: "[U]nder the FTCA, the [United States] stands in the shoes of the individual doctors and CAMcare simultaneously as sovereign, employer, and employee." *Young*, 152 F.Supp.3d at 348 (citing *Lomando*, 667 F.3d at 374-76); *see also United States v. Smith,* 499 U.S. 160, 166 (1991) ("Congress recognized that the required substitution of the United States as the defendant in tort suits filed against Government employees would sometimes foreclose a tort plaintiff's recovery altogether."). Thus, while the Court

recognizes that Plaintiffs' assertion may be meritorious if it were able to sue NCHC in state court, the FTCA requires a different result.

For the foregoing reasons, Section 8's $250,000 statutory cap applies to the United States in this matter, and the United States is comprised of both NCHC and Dr. Sabzwari pursuant to the FTCA.

## IV. CONCLUSION

For the reasons stated above, the Government's motion to dismiss is **DENIED** and the Government's motion for partial summary judgment is **GRANTED**. An appropriate Order accompanies this Opinion.

Dated: October 18, 2018

                                                                     _____
                                                                     John Michael Vazquez, U.S.D.J.